UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GRACE FLOOD,

                              Plaintiff,

             - against -

UBS GLOBAL ASSET MANAGEMENT, INC.,

                              Defendant.

10 Civ. 00374 (RJH)

**<u>MEMORANDUM OPINION
AND ORDER</u>**

Richard J. Holwell, District Judge:

        Plaintiff Grace Flood brings this action against her former employer, defendant UBS

Global Asset Management, Inc. ("UBS"), alleging gender discrimination and retaliation in

violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*,

and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8–101 *et seq.*

Before the Court is defendant's motion for summary judgment pursuant to Federal Rule of Civil

Procedure 56.  For the reasons that follow, the motion is GRANTED.

## BACKGROUND

        Flood worked for UBS from April 2006 until May 2008. (Def.'s 56.1 Statement ¶ 2.)

During that time, she worked for UBS's Financial Institutions Group ("FIG") as a member of its

business development team. (*Id.*)  Her team's primary role was to generate new business for

UBS. (*See id.*)  Flood had approximately fifteen years of experience in the asset management

industry and had worked for the Bank of New York immediately prior to joining UBS. (*Id.* ¶ 3;

*see* Pl.'s Dep. Ex. 24.)

While still working at Bank of New York, Flood obtained an interview with UBS after one of her contacts recommended her to Robert McGowan, the head of UBS's Financial Institutions Group. (Def.'s 56.1 Statement ¶ 4.)  McGowan interviewed Flood and recommended to his boss that she be offered a position on his team. (*Id.* ¶ 5.)  McGowan thought Flood came across as "hardworking, diligent, team-oriented, [and] results oriented." (*Id.*)  McGowan's boss, Mary Tritley, head of UBS's U.S. Institutional Business Practices group, approved McGowan's recommendation, and UBS offered Flood a position as a Director of New Business Development. (*Id.*)  At the time Flood was hired, the business development team consisted only of her and McGowan; McGowan was her boss. (*Id.* ¶ 6.)  Shortly after she started work, Flood met with McGowan to discuss how they would divide a list of prospective clients from whom they hoped to generate new business. (*Id.* ¶ 6.)  Flood and McGowan divided the list, and Flood was pleased with her list of prospects. (*Id.*)  In March 2007, UBS, through McGowan's recommendation, hired another Director of New Business Development named Atticus Fallon (a male). (*Id.* ¶ 14.)  Like Flood, Fallon reported to McGowan. (*Id.*)  After Fallon was hired, he, Flood, and McGowan met and decided how to divide the list of client prospects, and, as before, Flood was pleased with her share of the list. (*Id.* ¶ 15.)

Until August 2007, Flood had a positive experience working for McGowan. (*Id.* ¶ 9.)  Flood testified at her deposition that she believed McGowan was a supportive boss. (Pl.'s Dep. 164:2-4.)  He shared product knowledge with her, he helped her prepare for client conferences and sales calls, and he gave her positive feedback on her work performance.  (Def.'s 56.1 Statement ¶ 10.)  In a written performance evaluation at the end of 2006, McGowan gave Flood the rating of "2C." (*Id.* ¶ 11.)  A rating of "2C" indicates that the employee "meets profile" and is "effective." (*Id.*)  Tritley agreed with McGowan's assessment. (*Id.*)

By the spring of 2007, a year after she began working at UBS, Flood had not brought in

any new business. (*See id.* ¶ 12.)  Tritley testified at her deposition that this concerned her

because she expected that someone in Flood's position would have "something very actively

going" after a year on the job, but that Tritley "hadn't seen any evidence of [Flood's] ability to

close [new business]."  (Tritley Dep. 25:24, 28-29:2-4.)  Tritley also testified, however, that the

average time for an employee to close on new business was between twelve and eighteen months

and that closings before the twelve month mark would be "unusual." (*Id.* at 26:10-15.)

McGowan expressed similar concerns about Flood to Sarah Watson, one of UBS's

Human Resources professionals. (Def.'s 56.1 Statement ¶ 13.)  Watson testified, however, that

McGowan indicated that any issues with Flood "[weren't] too much of a cause of concern at that

point." (Watson Dep. 24.)

Flood's troubles began in August 2007.  Just prior to that time, in July 2007, two

portfolio managers, Vince Willyard and Joseph Devine, joined UBS from another firm.  Their

biggest and most important client was the Frank Russell Company ("Russell"). (Def.'s 56.1

Statement ¶ 16.)  Willyard and Devine managed more than $1 billion for Russell and wanted to

ensure that Russell's assets were transferred smoothly to UBS. (*Id.*)  At the time, Russell was

also one of Flood's prospect companies. (*Id.* ¶ 17.)  Before Willyard and Devine joined UBS,

Flood had attended at least two meetings with Russell and had met a manager from Russell, but

she had not brought in any business from the firm. (*See* Pl.'s Dep. 251-53.)  Flood did not know

any of Willyard's or Devine's contacts at Russell. (*Id.* at 350.)

Flood worked on transitioning Willyard and Devine's Russell account for approximately

six weeks. (Flood Decl. ¶ 2.)  Willyard and Devine testified that during that time, Flood called

them frequently and expressed an "eagerness to cross-sell [Russell] immediately into new

products." (Willyard Dep. 80:11-17.)  Devine testified that he considered the frequency of the phone calls to be "a little bit overbearing," (Devine Dep. 43:11-13), and Willyard considered them "annoying." (Willyard Dep. 80:12.)  Willyard and Devine were concerned that efforts immediately to solicit new business from Russell might upset Russell because Russell already was in a "bad mood" about Willyard and Devine's move to UBS. (Willyard Dep. 78:4-5.) Willyard and Devine felt they "needed to deliver a few quarters of really good performance" for Russell before Russell would be receptive to any new sales pitches. (*Id.* at 78:12-20.)  Willyard felt that Flood's "aggressive, salesy" approach could have jeopardized the relationship with Russell during a sensitive time. (Willyard Dep. Ex. 4.[1])  Flood disputes the extent and nature of her contacts with Willyard and Devine.  She denies that she repeatedly called them to express an eagerness to cross-sell products to Russell and asserts that she had only "infrequent email and telephonic contact with Willyard and his team . . . almost entirely in connection with moving the Russell accounts over to UBS." (Flood Decl. ¶ 2.)  Flood admits, however, that she informed Willyard and Devine that she "had had various communications and meetings with Russell in the past and gave [Willyard and Devine] an idea of the scope of UBS's familiarity with Russell." (*Id.*)

At some point, Willyard decided that Flood was not the best "personality fit" for the Russell account. (Willyard Dep. 87.)  He also testified that he believed the most senior member of the Financial Institutions Group should handle the transition because of its importance. (*Id.* at 86.)  Accordingly, Willyard called McGowan and requested that "the most senior person" be assigned to the Russell account. (*Id.*)  McGowan consulted with Tritley about Willyard's request, and they agreed that McGowan, the most senior business developer, should handle the Russell

---

[1] Exhibit 4 to Willyard's Deposition is a page of notes from an interview that Christine Menard of UBS's Human Resources department conducted with Willyard in response to Flood's internal complaint about gender discrimination.  The notes are dated October 24, 2007.

account. (Def.'s 56.1 Statement ¶ 21.)  Willyard made a similar request with respect to

Caterpillar, another one of Willyard's large clients. (*Id.* ¶ 22.)  In response, Tritley took over the

Caterpillar account from a man named Michael Howard, who previously had been assigned to it.

(*Id.*)  Although Flood was removed from the Russell account, she retained responsibility over

Willyard's third largest client, Northern Trust, who had over $400 million in assets with UBS.

(*Id.* ¶ 24.)

In mid-August 2007, McGowan left Flood a voicemail informing her of and explaining

the Russell reassignment. (*Id.* ¶ 23.)  McGowan explained that Willyard wanted the most senior

person on the account and that Willyard believed Flood was not the right "personality fit" for the

account. (*Id.*)  Flood testified that she believed McGowan's use of the phrase "personality fit" in

his voicemail was a "code word for possible gender issues" because it was "too vague" to

support "corrective action," because she had not made any errors relating to the Russell account,

and because Devine had told her that his Russell clients liked to be "wined and dined." (Pl.'s

Dep. 337-78; Flood Decl. ¶ 5.)

When she spoke to McGowan over the phone two days later, Flood asked him if she was

removed from the account because she was a "girl," or because it was a "guy's thing," a "boy's

club," or a "frat thing." (Def.'s 56.1 Statement ¶ 23.)  Flood testified that McGowan became very

angry and responded, "[D]on't even go there." (Pl.'s Dep. 342.)  She described his tone as

"[v]ery vehement," (*id.*), and asserted that he screamed at her. (Flood Decl. ¶ 4.)  Flood

interpreted McGowan's comment as a "threat that I had better not pursue the gender

discrimination issues I had just raised." (*Id.*)  Flood then asked McGowan if, in light of the

Russell reassignment, the prospect list would be re-examined. (Pl.'s Dep. 343.)  Flood testified

that McGowan then became even angrier and that she became frightened and started to shake.

5

(*Id.*)  Flood asserts that this conversation with McGowan "signaled a change in our relationship," (Flood Decl. ¶ 4.), because after the conversation McGowan "would be short in conversations, you know, like a bit colder." (Pl.'s Dep. 406.)  Flood also asserts that McGowan became angry and screamed at her again a few weeks after the conversation over a "minor scheduling snafu." (Flood Decl. ¶ 4.)

Shortly after the reassignment McGowan had appetizers and drinks with about twelve individuals, including about three individuals from Russell and five or six from Willyard and Devine's team. (McGowan Dep. 92.)[2]  Flood asserts that the day after socializing with the Russell clients, McGowan told her that he was hungover. (Pl.'s Dep. Ex. 39, at 2).  The reassignment did not have any direct impact of Flood's productivity because Russell never made any new investments through UBS during the relevant period.

 Flood asserts that another one of her prospects, the Pacific Life Company ("Pacific Life"), was wrongfully taken away from her.  In August 2007, Flood was the lead business development person on Pacific Life when McGowan, while golfing with a business contact, learned that Pacific Life was considering replacing the manager for its Large Cap Growth strategy. (*See* Def.'s 56.1 Statement ¶ 25.)  The information was not public and UBS learned of it only through the confidential information provided to McGowan during that golf game. (*Id.*)  As such, UBS considered it an opportunity that needed to be pursued discreetly. (*Id.*)

After learning about the Pacific Life opportunity, and about two weeks after the Russell incident, (*see* Pl.'s Dep. 405), McGowan discussed with Flood and Fallon how best to follow up on the lead. (Fallon Dep. 68-69.)  The decision-maker with respect to the Large Cap Growth opportunity at Pacific Life was Carleton Muench, the head of Pacific Life's Manager Research. (Def.'s 56.1 Statement ¶ 26; Fallon Dep. 37.)  Fallon knew Muench because they previously had

---

[2] The record does not reflect whether any of the attendees at this gathering were women.

worked together at another company. (Def.'s 56.1 Statement ¶ 27.)  In May 2007, Fallon introduced Flood to Muench over lunch. (*Id.*)  The parties dispute the nature of Fallon's relationship with Muench.  UBS describes it as a "longstanding personal relationship," (*id.* ¶ 26; *see* McGowan Dep. 125, 130), while Flood describes it simply as a "business contact," (Muench Dep. 17), noting in addition that there had been some conflict between the two men during their time as co-workers, (*see* Vorachek Dep. Ex. 1, at 9.).  It is undisputed that Muench and Fallon worked together for approximately two years from 2000 to 2001 and that they maintained sporadic contact after that time. (*See* Pl.'s 56.1 Statement ¶ 26.)  Around September 20, 2007, McGowan decided that Fallon should make the initial contact with Muench regarding the Large Cap Growth opportunity. (Def.'s 56.1 Statement ¶ 28.)  On that day, McGowan left Flood a voicemail informing her of the decision. (*See* Pl.'s Dep. Ex. 25 (transcript of the voicemail).)   In the same voicemail, McGowan suggested that he and Flood set up a conference call with "Dewey" at Pacific Life in the next week or so in order to discuss a different business opportunity. (*See id.*)  "Dewey" referred to Dewey Bushaw, an individual at Pacific Life with whom Flood had developed a relationship. (*See* Pl.'s Dep. 401-02.)  Flood considered her contacts at Pacific Life to be "key persons." (Pl.'s Dep. Ex. 24, at 1.)  Flood asserts that prior to McGowan's decision on the Large Cap Growth opportunity, she told McGowan that she thought having Fallon pursue the opportunity would interfere with her ongoing efforts with Pacific Life. (Pl.'s Dep. Ex. 24, at 2.)

Flood continued to pursue other opportunities with Pacific Life, including a product known as the 130/30, in which Pacific Life had expressed interest. (Def.'s 56.1 Statement ¶ 28.) Flood prepared a Request for Proposal in connection with a meeting in Chicago during which UBS would pitch the 130/30 opportunity to Pacific Life. (*Id.* ¶ 29.)  Flood also attended a

meeting with Pacific Life in New York where UBS pitched the Large Cap Growth opportunity. (*Id.* ¶ 30.)  Flood asserts that she originally was not included on the agenda for the Large Cap Growth meeting and was added only after she complained about being excluded. (Pl.'s 56.1 Statement ¶ 29.)[3]  In any event, this initiative failed as Pacific Life decided not to hire UBS as the manager for its Large Cap Growth strategy.

On September 25, 2007, after the events involving Russell and Pacific Life, Flood emailed Human Resources with a request to discuss a "serious discrimination/retaliation issue." (Def.'s 56.1 Statement ¶ 31.)  That same day, Flood met with Sarah Watson and Toby Sagiv of UBS's Human Resources department and explained that she felt that the Russell reassignment had been discriminatory based on her gender and that the Pacific Life incident had been both discriminatory and in retaliation for questioning McGowan about the Russell reassignment. (*Id.* ¶ 32.)  Watson and Sagiv asked Flood to put her complaint in writing.  Flood did so and on October 1, 2007 sent an email memorandum to Sagiv setting forth the details of her complaint. (*See* Pl.'s Dep. Ex. 24.)

Watson and Sagiv reviewed the complaint with their boss, Ana Ibis Seebrath, the head of Human Resources for UBS's Global Asset Management group in the Americas, and scheduled a meeting with Flood and McGowan to discuss the allegations. (Def.'s 56.1 Statement ¶ 34.)  On October 3, 2007, Watson and Sagiv met with Flood and McGowan, but the group could not resolve Flood's concerns. (*Id.* ¶ 35.)  Accordingly, Watson indicated that Human Resources would conduct a full investigation. (*Id.*)

Christine Menard, a Human Resources manager in UBS's Hartford office, conducted the investigation.  During the course of the investigation, which lasted several weeks, Menard

---

[3] At some point after these events, Muench discussed with McGowan and Fallon the possibility of Fallon becoming the primary contact for Pacific Life because Muench felt that Flood called him and his staff too frequently. (Muench Dep. 34-36.)  After these discussions, UBS took Flood off the Pacific Life account.

interviewed Flood, McGowan, Fallon, Tritley, and Willyard. (*Id.* ¶ 38.)  Menard also
interviewed Nancy Fahmy and Rachel Wood. (Pl.'s 56.1 Statement ¶ 38.)  Fahmy and Wood
were employees of the Financial Institutions Group; like Flood, they reported to McGowan. (*See
id.*)  Although Menard recalls being cautious not to reveal "any identifying information" during
the interviews with Fahmy and Wood, (Menard Dep. 85), the record suggests that Wood became
aware that Flood had made a complaint against McGowan. (*See* Tritley Dep. 88.)  Menard did
not interview anyone at Russell, nor did she interview Carleton Muench, the head of Manager
Research at Pacific Life. (Pl.'s 56.1 Statement ¶ 38.)  At the conclusion of the investigation,
Seebrath and Menard issued a six-page report.  The report concluded that Flood's claims of
gender discrimination and retaliation were without merit. (*See* Pl.'s Dep. Ex 37.)  As Flood
points out, the report indicated that during the investigation, "Vince [Willyard] stated that he was
concerned at what he described as Grace's 'aggressive' approach." (*Id.* at 4.)  The report also
indicated that "Grace was described by team members as, at times, friendly and helpful and, at
other times, sporadically rude and abrasive." (*Id.* at 6.)  The report also notes that members of
McGowan's team "described him as passionate." (*Id.* at 4.)

On November 5, 2007, Seebrath, Menard, Flood, and McGowan met to discuss the
report.  During the meeting, Flood stated repeatedly that she disagreed with the report's findings.
In response, Seebrath asked Flood to "tell us what you want here." (Pl.'s Dep. 305.)  Flood
interpreted this comment to mean that Seebrath was suggesting that Flood resign. (*See id.* at
306.)  Flood responded that she valued her job and that she wanted to continue to work at UBS.
(*Id.*)  Seebrath then explained that UBS would be willing to hire an outside investigator to
conduct a second investigation, but Flood did not offer an opinion on that option at the meeting.
(Def.'s 56.1 Statement ¶ 41.)

On December 3, 2007, Flood sent an email to Seebrath and Menard in which she detailed her criticisms of their report. (*See* Pl.'s Dep. Ex. 39.)  Among other things, Flood's email asserts that the report "did not consider pertinent information," "is replete with factual errors and contradictions," and "contains discriminatory and insulting stereotypical statements about [Flood]." (*Id.* at 1-2.)  Specifically, Flood faulted UBS for ignoring McGowan's behavior after Flood questioned him about the Russell assignment, for failing to consider that Flood was "senior" enough to handle the Russell account, for failing to investigate the history of Fallon and Muench's relationship, and for "solicit[ing]" from Flood's co-workers descriptions of her as "aggressive," "rude," and "abrasive." (*See id.*)

In light of Flood's disagreement with the initial report, UBS hired an outside attorney to conduct a second investigation.  The second investigation was conducted by Darlene Vorachek, a Chicago civil rights attorney with experience in conducting these types of investigations. (Def.'s 56.1 Statement ¶ 43.)  Like Menard, Vorachek interviewed Flood, McGowan, Fallon, Tritley, Wood, Fahmy, and Willard. (*Id.* ¶¶ 45, 47.)  Vorachek also interviewed Sagiv, Menard, Seebrath, and Devine. (*Id.* ¶ 47.)  Vorachek reviewed emails, personnel files, performance evaluations, and UBS policies, as well as Flood's notes from the prior investigation. (*Id.* ¶ 44.)  Vorachek did not interview anyone at Russell, nor did she interview Carleton Muench. (*See* Pl.'s 56.1 Statement ¶ 44, 46.)  On February 28, 2008, Vorachek issued a nineteen page report detailing her findings. (*See* Vorachek Dep. Ex. 1.)  Like Menard and Seebrath's report, Vorachek's report determined that Flood's claims were without merit.  Flood received a copy of the report on March 6, 2008. (Def.'s 56.1 Statement ¶ 53.)

On March 18, 2008, Flood emailed Mika Kishimoto (who had taken over for Watson while Watson was on maternity leave) to express her disagreement with Vorachek's report. (*See*

Pl.'s Dep. Ex. 46.)  The next day, Kishimoto and Seebrath met with Flood and McGowan to discuss the report.  Seebrath expected Flood to be prepared to address the report in detail in order to finalize the matter, (*see* Seebrath Dep. 165), but Flood testified that she had not been asked to do so prior to the meeting. (Pl.'s Dep. 309.)  Accordingly, Flood told Seebrath at the meeting that she had not yet had the opportunity to review the report in detail and therefore was not prepared to go through it in the manner Seebrath desired.  At this point, Seebrath told Flood that she was being "uncooperative" and that "[t]his has been very disruptive to the group." (Pl.'s Dep. 309-10.)  Flood's testimony suggests that McGowan also stated, "[T]his was a big distraction, huge . . . for the team." (*Id.* at 320.)  Flood testified that Seebrath also told her that she "could never again raise these false accusations." (*Id.*)  Flood believed that it was unclear whether Seebrath intended those comments to imply that Flood would be prohibited from bringing future claims of discrimination. (*See id.* at 311-12.)  Seebrath, on the other hand, testified that she told Flood to come to her if there were any further issues. (*See* Seebrath Dep. 167:19-24.)

Approximately two weeks later, Flood again met with Seebrath and Kishimoto.  Seebrath told Flood that she wanted to discuss what Flood "now wanted going forward." (Pl.'s Dep. 313.)  Flood again explained that she valued her job and that she felt she could continue to be a productive member of the team. (*Id.*)  Flood at his point believed she no longer had any power to pursue further her discrimination claims internally. (*Id.*)  Flood also believed, based on the events described above, that Seebrath and McGowan wanted her to leave UBS. (*Id.* at 315.)

Throughout the period of the investigations, Flood continued to work with McGowan and Fallon. (Def.'s 56.1 Statement ¶ 56.)  McGowan described his relationship with Flood during that time as "[p]rofessional." (McGowan Dep. 272:15-18.)  Flood does not allege that she was demoted, transferred, or subject to a reduction in salary at any point during the investigations;

she asserts, however, that her prospect list should have been revised in light of the events regarding Russell and Pacific Life. (*See* Pl.'s 56.1 Statement ¶ 56.)  In addition, Tritley testified that, during a performance review held in early 2008, she told Flood that Flood was expected to bring in new business in 2008 and that "it was very clear in the meeting that 2008 was kind of a make or break year for Grace in terms of her role." (Tritley Dep. 143:6-17.)  Flood does not dispute Tritley's description of the performance review meeting, but instead asserts that Tritley's comments were unfair because they failed to recognize significant accomplishments that Flood made during the year. (*See* Pl.'s Dep. Ex. 40.)

Beginning in 2007 and continuing into 2008, UBS reduced its workforce in light of the ongoing economic downturn. (Def.'s 56.1 Statement ¶ 57.)  In April 2008, Tritley's boss, Kai Sotorp, directed Tritley to terminate a number of employees in her division, including one employee from the Financial Institutions Group. (*Id.*)  Tritley in turn instructed McGowan to recommend one of his employees for termination. (*Id.* ¶ 58.)  McGowan recommended Flood. (*Id.* ¶ 60.)[4]  Tritley approved. (*See id.* ¶ 71.)

McGowan testified that he based his decision in part on the fact that Flood had brought in less business than Fallon, (*see* McGowan Dep. 317:10-13)[5], and in large part on his assessment that Fallon's "criticality" to UBS was greater than Flood's. (*Id.* at 317-319.)  With respect to the "criticality component," McGowan considered the quality of Flood's relationships with other

---

[4] McGowan testified that he decided not to fire an employee whose role focused on maintaining relationships with existing clients because, in McGowan's view, maintaining existing clients was of primary importance at that time. (*See* McGowan Dep. 316, 320.)  McGowan believed that generating new business would prove very difficult in the ensuing year or so given the economic downturn and the recent harm to UBS's reputation as a result of allegations of improper tax management and historic investment banking losses. (*See id.* at 316, 320-21.)  Accordingly, McGowan decided to fire one of the business developers—*i.e.*, either Flood or Fallon. (*Id.* at 316-17.)

[5] During her time at UBS (over two years), the only new business Flood secured was a $6 million dollar commitment from a client named Wilshire. (Def.'s 56.1 Statement ¶ 61.)  By comparison, in Fallon's first year at UBS, he secured an $80 million commitment from a firm named Guidestone. (*Id.*)

team members, Flood's potential to become a leader within UBS in the future, and the potential impact on the team and its business of Flood's departure. (*See id.* at 318.)

McGowan testified that other employees in the Financial Institutions Group found Flood to be "annoying" or "overly aggressive, pushy." (McGowan Dep. 197:17-25; 198.)  In peer-review evaluations from the end of 2007, Flood's co-workers provided written feedback on those areas of her personality they found objectionable. (*See, e.g.*, Flood Dep. Ex. 15 (peer-review stating that Flood "tends to relentlessly follow-up on requests, without giving the person a chance to work on the request/project); *id.* Ex. 16 ("Grace's action orientation can sometimes lead to unintended conflicts with other teams.  If she could be more aware of this, and be a bit less aggressive, that would make her even more effective."); *id.* Ex. 17 ("Grace also over follows-up with me . . . .").)  The reviews also include positive comments. (*See, e.g.*, *id.* Ex. 15 ("Extremely knowledgeable about the industry"); *id.* Ex. 16 ("Grace is pleasant to deal with in one-on-one situations and can be a good team player"); *id.* Ex. 17 ("Grace is very passionate about her clients and is eager to please them.").)  McGowan also testified that he considered Fallon to have greater long term potential at UBS than Flood. (McGowan Dep. 319.)  According to McGowan, others at UBS recognized Fallon's potential as well. (*See id.* (an executive at UBS told McGowan, "This is a guy . . . I don't want to lose").)  Fallon also received higher "criticality" scores on performance evaluations than Flood. (Tritley Decl. ¶ 4.)

UBS fired Flood on May 14, 2008. (Def.'s 56.1 Statement ¶ 74.)  Tritley fired six other employees from her division as part of the reduction in force. (*Id.* ¶ 73.)  Four were male and two were female. (*Id.*)  At present, UBS has not hired anyone to replace Flood as a member of the business development team. (*Id.* ¶ 75.)

Flood filed this action on January 15, 2010, alleging claims of gender discrimination and retaliation under Title VII and the NYCHRL.  On June 1, 2011, UBS moved for summary judgment.

## LEGAL STANDARD

Summary judgment is proper if the moving party shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In deciding whether there is a genuine issue of material fact as to an element essential to a party's case, the court must examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (internal quotation marks omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The moving party must demonstrate that no genuine issue exists as to any material fact.  *Celotex*, 477 U.S. at 323-25.  As to an issue on which the non-moving party bears the burden of proof, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325 (rejecting a construction of Rule 56(c) that would require the party moving for summary judgment to produce evidence affirmatively establishing the absence of a genuine issue of material fact with respect to an issue on which the nonmoving party bears the burden of proof).

If the moving party makes such a showing, the "non-movant may defeat summary judgment only by producing specific facts showing that there is a genuine issue of material fact for trial."  *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996); *Celotex*, 477 U.S. at 322-23.  In seeking to show that there is a genuine issue of material fact for trial, the non-moving party

cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present

affirmative and specific evidence showing that there is a genuine issue for trial. *See Anderson*,

477 U.S. at 256-57; *Gross v. Nat'l Broad. Co.*, 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002).

Affidavits submitted to defeat summary judgment must be admissible themselves or must

contain evidence that will be presented in an admissible form at trial. *See H. Sand & Co. v.

Airtemp Corp.*, 934 F.2d 450, 454-55 (2d Cir. 1991) (stating that "hearsay testimony that would

not be admissible if testified to at the trial may not properly be set forth in [a Rule 56] affidavit")

(internal quotation marks and citation omitted).

The Second Circuit has "repeatedly expressed the need for caution about granting

summary judgment to an employer in a discrimination case," especially "where . . . the merits

turn on a dispute as to the employer's intent." *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d

Cir. 2008). "Even in the discrimination context, however, a plaintiff must provide more than

conclusory allegations to resist a motion for summary judgment, and show more than some

metaphysical doubt as to the material facts." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93,

101 (2d Cir. 2010) (internal quotations and citations omitted). Indeed, "[i]t is now beyond cavil

that summary judgment may be appropriate even in the fact-intensive context of discrimination

cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).

## DISCUSSION

### A.  Title VII Claims

Title VII claims are generally analyzed using the three step burden-shifting approach first

laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972). *Mathirampuzha v. Potter*,

548 F.3d 70, 78 (2d Cir. 2008). Under the *McDonnell Douglas* approach, the plaintiff bears the

initial burden of establishing a prima facie case. *Id.*; *Williams v. R. H. Donnelley Corp.*, 368

F.3d 123, 126 (2d Cir. 2004).  To establish a prima facie case of gender discrimination, a plaintiff must demonstrate that (1) she belongs to a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *See, e.g.*, *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000).  A prima facie case of retaliation requires a showing that (1) the employee engaged in protected participation or opposition under Title VII, (2) the employer was aware of this activity, (3) the employer took adverse action against the plaintiff, and (4) a causal connection exists between the protected activity and the adverse action.  *Cifra v. General Electric Co.*, 252 F.3d 205, 216 (2d Cir. 2001).

If the plaintiff satisfies this burden, the employer is rebutably presumed to have violated Title VII.  The burden then shifts to the employer, who must provide a legitimate, nondiscriminatory business rationale to justify its conduct.  *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 248 (1981) (citing *McDonnell Douglas*, 411 U.S. at 802).  If the employer provides such a rationale, the presumption created by the prima facie case "drops out." *Roge v. NYP Holdings, Inc.*, 257 F.3d 164 (2d Cir. 2001).  To defeat summary judgment, the plaintiff must then present admissible evidence of "circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Terry*, 336 F.3d at 139 (quoting *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).

### 1.  Gender Discrimination

With respect to Flood's burden of establishing a *prima facie* case of gender discrimination, it is undisputed that Flood, as a woman, is a member of a protected class.  The parties, however, dispute whether Flood has met her burden of production with respect to the

other three elements—that is, whether she was qualified for her position, whether she suffered an adverse employment action, and whether the action occurred under circumstances giving rise to an inference of discrimination.

### a.   Minimal Qualification

In order to establish the second element of a *prima facie* case under the *McDonnell Douglas* analysis, Flood "only needs to demonstrate that she 'possesses the basic skills necessary to the performance of the job.'"  *Owens v. N.Y. City Housing Auth.*, 934 F.2d 405, 409 (2d Cir. 1991).  UBS addresses this prong of the test only in a footnote, pointing out that Flood could not have been qualified for her job because her job was to bring new business to UBS, which she did not do.  The record, however, shows that Flood brought $6 million of new business to UBS.  In addition, while securing new business was a critical part of her job, it was not the only part.  The record shows that Flood worked for six weeks on the transition of Willyard and Devine's Russell account and that she did so without error.  The record also shows that Flood had many years of experience in roles comparable to her role at UBS and that her co-workers considered her extremely knowledgeable about the industry.  That Flood did not in fact bring significant new business to UBS is not fatal to her *prima facie* case because "all that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that [she] satisfies the employer." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001).  Accordingly, Flood has satisfied the second element of her *prima facie* case of gender discrimination.

### b.   Adverse Employment Action

Flood contends that she suffered three adverse employment actions because of her gender:  (1) the assignment of the Russell account to McGowan, (2) the assignment to Fallon of

the Pacific Life Large Cap Growth opportunity, and (3) her termination.  It is undisputed that Flood's termination constitutes an adverse employment action.  UBS, however, argues that the Russell and Pacific Life reassignments do not constitute adverse employment actions sufficient to support a *prima facie* case of gender discrimination.

In the discrimination context, an adverse employment action is a "materially adverse change in the terms and conditions of employment" that is "more disruptive than a mere inconvenience."  *Galabya v. N.Y. City Board of Ed.*, 202 F.3d 636 (2d Cir. 2000) (quoting *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 126 (7th Cir. 1993)).  "'Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.'"  *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)).

Flood argues that the Russell and Pacific Life reassignments constitute materially adverse changes in her employment because she had made significant headway in soliciting business from those clients.  Taking them away, according to Flood, amounted to a serious professional setback, especially in an industry where the average lead time to a sale is eighteen months and compensation is based in part on the employee's ability to generate business.  The nature and quality of Flood's contacts with Russell and with Carleton Muench at Pacific Life are in dispute.  UBS attempts to downplay their significance, but when viewed in the light most favorable to Flood, a reasonable factfinder could conclude that Flood had made significant progress with the two firms and that losing them as clients was a materially adverse change in her employment. *See Virola v. XO Commc'ns, Inc.*, 05 Civ. 5056, 2008 WL 1766601, at *17 (E.D.N.Y. Apr. 15,

2008) (concluding that "having an account transferred to another sales associate constitutes an adverse employment action . . . [where] the plaintiffs were compensated partly on commission").[6]

### c. Circumstances Giving Rise to an Inference of Discrimination

A plaintiff's burden at the *prima facie* stage to offer evidence of circumstances giving rise to an inference of discrimination is "'minimal' and '*de minimis*.'" *Zimmerman v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) (quoting *Byrnie v. Town of Cromwell*, 243 F.3d 93, 101 (2d Cir. 2001); *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001)). "[T]he mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage of the Title VII analysis." *Id.* (citing *Tarshis v. Riese Org.*, 211 F.3d 30, 36 (2d Cir. 2000); *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1239 (2d Cir. 1995)); *see also Gladwin v. Pozzi*, 403 F. App'x 603, 606 (2d Cir. 2010). In addition, "[t]he transfer of a plaintiff's responsibilities to a worker not within the protected group or the failure to offer a plaintiff another available position for which she qualified are other relevant factors from which discrimination could be inferred." *Pearlstein v. Staten Island Univ. Hosp.*, 886 F. Supp. 260, 267 (E.D.N.Y. 1995) (citing *Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 105 (2d Cir. 1989)). With respect to the Russell and Pacific Life reassignments, Flood was replaced in each instance by a male. She thus has established a *prima facie* case of discrimination with respect to those actions. Regarding her termination, however, Flood was not, and has not been, replaced by a new

---

[6] The Vorachek Report explains that the incentive compensation structure for the Financial Institutions Group is not based on a mathematical formula because the group operates as a team. (*See* Vorachek Report 18.) Thus, individual employees do not receive automatically a commission when they bring new business to UBS. Instead, incentive compensation is awarded based on managerial discretion and is based on a variety of factors relating to the employee's performance. *See id.* While this would make it difficult for an employee to quantify any loss in compensation as the result of a reassignment of a prospect, given that the nature and quality of the relationship a UBS employee is able to develop with a prospect is relevant to the employee's incentive compensation, (*see id.*), the reassignment of a promising prospect reasonably may be viewed as materially adverse.

employee.  Nonetheless, the record suggests that her clients and prospects would have been divided between McGowan and Fallon following her termination.  Thus, Flood's job responsibilities were transferred to two males, who, after Flood's termination, comprised the entirety of the Financial Institution Group's business development team.  Although this fact gives rise to a rather weak inference of discrimination, at the *prima facie* stage, it provides sufficient proof to suggest that "the decision-maker showed a 'preference for a person not of the protected class.'" *Giannone v. Deutsch Bank Secs., Inc.*, 392 F. Supp. 2d 576, 587 (S.D.N.Y. 2005) (quoting *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000)).  Accordingly, Flood has established a *prima facie* case of discrimination.

### d.  Legitimate Non-discriminatory Reason and Pretext

UBS offers a legitimate, non-discriminatory reason for each of its alleged discriminatory actions.  It explains that (1) McGowan replaced Flood on the Russell account because Willyard wanted the most senior business developer to handle his largest and most important client, (2) Fallon replaced Flood on the Pacific Life Large Cap Growth opportunity because the opportunity was a sensitive one and Fallon had known Muench, the decision-maker at Pacific Life, for years, and (3) Flood was terminated in a reduction in force.

Thus, the burden shifts back to Flood to produce evidence that UBS's explanations are pretextual.  To do so, Flood "must produce evidence such that a rational finder of fact could conclude that the adverse action taken against her was more likely than not a product of discriminatory animus." *Leibowitz v. Cornell Univ.,* 584 F.3d 487, 504 (2d Cir. 2009).  In that regard, "'speculation alone is insufficient to defeat a motion for summary judgment.'" *Clemente v. N.Y. State Div. of Parole*, 684 F. Supp. 2d 366, 371 (S.D.N.Y. 2010) (quoting *McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006)).  Nonetheless, the Court is

sensitive "to the fact that employers are rarely so cooperative as to include a notation in the personnel file that the [adverse employment action] is for a reason expressly forbidden by law." *Holcomb v. Iona College*, 521 F.3d 130, 141 (2d Cir. 2008) (quoting *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464-65 (2d Cir. 1989)).  Summary judgment, however, will be appropriate "if the record conclusively reveals some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 249 (2d Cir. 2005) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

　　　　With respect to the Russell account reassignment, Flood attempts to rebut UBS's explanation with the following facts:  (1) Devine told Flood that his Russell clients liked to be "wined and dined," (2) McGowan went out drinking with the Russell clients shortly after the reassignment, (McGowan Dep. 90-93), and (3) when Flood asked McGowan whether the reassignment was based on her gender, McGowan became angry and said, "Don't even go there."

　　　　Flood asserts that she believed Devine's statement about "wining and dining" his Russell clients was meant to suggest that Devine wanted a man to entertain them. (*See* Pl.'s Dep. 350-51.)  Flood, however, cites no evidence to support that inference aside from her subjective belief in its truth.  Flood points to no remarks or actions by Devine or Willyard to the support the notion that the phrase "wined and dined" reasonably could be interpreted to mean "wined and dined by a man."  That McGowan, a man, in fact was assigned to the account and in fact went out drinking with the Russell clients does little to help Flood.  Any significance those facts otherwise may have had is largely neutralized by the fact that, at Willyard's request, another one

of his large clients, Caterpillar, was reassigned from Michael Howard, a man, to Mary Tritley, a woman.

Flood's argument is further undermined by the fact that Willyard and Devine did not request that Flood be removed from the Northern Trust account, their third largest client. Finally, McGowan's reaction to Flood's questions about the rationale behind the Russell reassignment, even if made as "vehement[ly]" or angrily as Flood contends, is insufficient to create a genuine issue of material fact. Flood testified that she had never seen McGowan make an inappropriate remark or otherwise treat other female employees inappropriately. (*See* Pl.'s Dep. 346-47.) Other UBS employees expressed the same sentiment. (*See* Decl. of Rachel Wood ¶ 2; Decl. of Mary Tritley ¶ 3.) Flood nonetheless suggests that such an outburst indicates an admission of guilt on McGowan's part. But absent any additional facts to support such an interpretation, Flood's argument is merely speculative. While McGowan's reaction (if indeed made as Flood describes it) may not be an example of model behavior, it is hardly suggestive of discriminatory animus. Indeed, its significance is particularly weak given the fact that McGowan recommended hiring Flood just sixteen months earlier and that he consistently supported her after that time. *See Romano v. Stora Enso Corp.*, No. CV 07-4293, 2010 WL 986535, at *14 (E.D.N.Y. Feb. 12, 2010) ("Where the same individual hires an employee, and within a relatively short span of time thereafter decides to terminate the employee, a strong inference exists that discrimination was not the motivating factor for the termination."). It would make little sense to infer that in a relatively short time, McGowan would shift from avidly supporting Flood to actively discriminating against her based on her gender. Given that it is undisputed that McGowan was the most senior person in the Financial Institutions Group and that Flood has offered only conjectural evidence of gender discrimination, Flood has failed to

meet her burden of showing a genuine issue of material fact with respect to the Russell reassignment.

Flood's argument with respect to Pacific Life fares little better.  McGowan decided that Fallon, rather than Flood, should pursue the Large Cap Growth opportunity with Carleton Muench because the opportunity was a sensitive one and Fallon had known Muench for years. While the nature and quality of Fallon's relationship with Muench is disputed, it is undisputed that Fallon had known Muench longer than Flood, that Fallon previously worked with Muench, and that their relationship was at least "professional," (Muench Dep. 17).  Moreover, aside from the fact that Fallon was a male, there is no evidence that McGowan's decision was based on Flood's gender.  In addition, it is undisputed that the Financial Institutions Group worked as a team and that McGowan, Fallon, and Flood occasionally would pursue opportunities with firms on another person's prospect list if doing so was thought to be in the team's best interest. (*See* Pl.'s Dep. 216 (discussing a situation where the Financial Institutions Group jointly brought in new business).)  Thus, while Flood now disagrees with the business rationale for the Pacific Life decision, "'it is not the function of a fact-finder to second guess business decisions . . . [unless] the employer's 'business decision' was so lacking in merit as to call into question its genuineness.'" *Flaherty v. Metromail Corp.*, 293 F. Supp. 2d 355, 362 (S.D.N.Y. 2003) (quoting *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1116 (2d Cir.1988)).  McGowan's decision was not of this type.  Accordingly, Flood has failed to meet her burden with respect to Pacific Life.

Flood also contends that her termination was discriminatory.  In addition to the facts that Flood believes rebut UBS's explanations with respect to Russell and Pacific Life, Flood argues that the following additional facts support the conclusion that her termination was

discriminatory:  (1) that UBS conducted an inadequate investigation of her complaint to Human

Resources by failing sufficiently to investigate the frequency of her contacts with Russell and by

failing to interview Carleton Muench to determine the nature of his relationship with Fallon, (2)

that a number of her co-workers (both male and female) described her as "aggressive" and

"annoying," (3) that UBS's initial report on her complaint likewise described her as "aggressive"

and "abrasive," while describing McGowan as "passionate," (*see* Def.'s App'x, Tab K) and (4)

that Seebrath, a senior member of Human Resources, called Flood "uncooperative" and

"disruptive" during a meeting held to discuss Vorachek's report on Flood's discrimination

claims.

With respect to her first argument, Flood appears to contend that because she is a woman,

UBS refused to investigate "essential allegations" in her complaint. (Pl.'s Mem. 11.)  This

refusal, Flood contends, indicates an animus towards her as a woman that ultimately resulted in

her termination.  The scope of UBS's investigation, however, does not suggest an animus

towards women.  UBS interviewed numerous employees in connection with Flood's complaint,

and the resulting report is hardly evidence of discriminatory animus.  Indeed, it criticizes

*McGowan*'s handling of the Russell situation, stating that he should have been more professional

in informing Flood of the reassignment (that is, not simply by voicemail). (*See* Menard Report

3.)  That Flood would have preferred UBS to interview people outside the company to

investigate her claims does not render the investigation so inadequate as reasonably to permit a

rational factfinder to conclude that Flood's termination was discriminatory.  And although the

report uses terms like "aggressive" and "abrasive" to describe Flood, while using terms like

"passionate" to describe McGowan, (*id.* at 4, 6), the report uses those terms because they were

the terms used by the witnesses UBS interviewed.  Nothing in the report suggests that UBS

adopted the witnesses' opinions on Flood's personality, and, in any event, these comments by Flood's co-workers are too tangentially connected to her termination to support an inference about its cause. *See Adam v. Glen Cove Sch.*, No. 06 Civ. 1200, 2008 WL 508689, at *8 (E.D.N.Y. Feb. 21, 2008) (no inference of discrimination from comments made by "a co-worker, not a supervisor, and [where] there is no evidence whatsoever that [the co-worker] had any involvement in any decision-making related to plaintiff or anyone else").

Flood also argues that UBS interviewed unnecessary witnesses in its investigation, and that its decision to do so is evidence of discriminatory animus.  Flood appears to draw the following chain of inferences:  UBS interviewed Wood and Fahmy even though they had no involvement with the alleged discriminatory conduct.  As a result, Wood and Fahmy (and eventually the rest of the Financial Institutions Group) became aware that Flood had made a discrimination claim against McGowan, the leader of the entire Financial Institutions Group.  In an effort to please McGowan (their boss), the other members of the Financial Institutions Group made negative comments about Flood in her peer reviews.  These negative comments adversely impacted Flood's criticality scores and were a factor in UBS's ultimate decision to terminate her.  According to Flood, these facts suggest that UBS, in a show of gender based animus, unnecessarily expanded its investigation of her discrimination claims in an attempt to turn her co-workers against her and then to use her co-workers' resulting criticisms to justify her termination.

The argument is without merit.  There is nothing plainly discriminatory about interviewing other employees of the alleged discriminator to determine if the discriminator committed any other arguably discriminatory actions.  Indeed, such investigative techniques appear reasonable because an alleged discriminator's treatment of other members of the

plaintiff's class may support an inference of discrimination. *See Leibowitz*, 584 F.3d at 502 (inference of discrimination may be shown by an employer's "invidious comments about others in the employee's protected group"). Moreover, there is no evidence in the record to suggest that the negative comments in Flood's peer reviews were made with the intent of harming her standing at UBS, rather than in an effort to help her improve her performance. Flood's argument to the contrary is based on nothing more than speculation.

Seebrath's remark that Flood was "uncooperative" and "disruptive to the group" is only slightly more probative. Seebrath, a female, had supervised the UBS investigation, which, as explained above, provides next to no evidence of discriminatory animus. The context of Seebrath's comments was a meeting in which Seebrath expected the parties to reach a final disposition on Flood's discrimination claims. They were unable to do so, however, because Flood was not prepared to discuss the Vorachek report in detail. Given the context in which the comments were made and the fact that they are gender neutral, Seebrath's comments, even when taken in conjunction with Flood's additional evidence of discrimination, are insufficient to create a genuine issue as to whether UBS fired Flood because of her gender. Accordingly, UBS is entitled to summary judgment on Flood's Title VII discrimination claim.

### 2. Retaliation

#### a. Protected Activity

For purposes of Title VII, an employee engages in a "protected activity" when she protests or opposes an employment practice that she reasonably believes, in good faith, violates the law. *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir. 2006). Informal as well as formal complaints can constitute a protected activity. *Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir. 1990). An employee "may prevail on a claim for retaliation

even when the underlying conduct complained of was not in fact unlawful so long as he can

establish that he possessed a good faith, reasonable belief that the underlying challenged actions

of the employer violated [the] law." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir.

2002) (internal quotation marks omitted).

    The parties do not dispute that Flood's complaint to Human Resources constitutes a

protected activity. [7]  They disagree, however, about whether Flood still was participating in a

protected activity when she met for the final time with Seebrath to discuss the Vorachek Report

on or about April 1, 2008.  UBS contends that Flood's participation in a protected activity

concluded, at the latest, in early March 2008, when the Vorachek Report initially was shared

with Flood.  As late as March 28, 2008, however, Flood sent an email to Seebrath reiterating her

disagreement with the findings of the investigation and restating her belief that she had been the

victim of discrimination and retaliation. (*See* Flood Ex. 44.)  Based on Flood's continued

objections to both reports, a reasonable factfinder could conclude that Flood opposed an

unlawful employment practice until her final meeting with Seebrath on or around April 1, 2008.

In addition, Flood suggests, and UBS does not dispute, that she participated in a protected

activity when she asked McGowan whether the Russell reassignment was the result of a "boys'

club" or "frat thing."  Accordingly, for purposes of this motion, the Court assumes that this

interaction constitutes a protected activity. *See Gallo v. Alitalia-Linee Aeree Italiane-Societa per*

---

[7] The fact that the Court has granted summary judgment to UBS on Flood's underlying discrimination claims does not mean that no reasonable factfinder could conclude that Flood possessed a good faith, reasonable belief that she was the victim of unlawful discrimination. *See MacMaster v. City of Rochester*, No. 05 Civ. 6509, 2009 WL 63045, at *5 (W.D.N.Y. Jan. 6, 2009).  Indeed, "[a] finding of unlawful retaliation is not dependent on the merits of the underlying discrimination complaint." *Davis v. State Univ. of N.Y.*, 802 F.2d 638, 642 (2d Cir. 1986); *see also Iannone v. Frederic R. Harris, Inc.*, 941 F. Supp. 403, 410 (S.D.N.Y. 1996) ("[A] good faith mistake, whether of fact or law, regarding the legality of the employer's conduct will not strip the plaintiff of Title VII protection against retaliation.").  Here, Flood believed the Russell reassignment was based on her gender because (1) McGowan took her place on the account, (2) Devine told her that his Russell clients liked to be wined and dined, (3) she had not made any errors on the Russell account, and (4) McGowan became angry when she asked him whether the reassignment was gender related.  Although these facts ultimately are insufficient to permit a reasonable factfinder to conclude that gender more likely than not played a part in the decision, they nonetheless appear sufficient to permit a rational finder to conclude that Flood's belief to that effect was reasonable.

*Azioni*, 585 F. Supp. 2d 520, 542 (S.D.N.Y. 2008) (finding a protected activity where plaintiff complained to his supervisor about the supervisor's allegedly discriminatory conduct).  In addition, there is no dispute that UBS was aware of Flood's protected activities.  Thus, Flood satisfies the first two elements of a *prima facie* case of retaliation.

### b.  Adverse Employment Action

Flood argues that "[v]irtually all" of UBS's conduct following Flood's phone call with McGowan regarding the Russell reassignment was retaliatory. (Pl.'s Mem. 11.)   In her brief, Flood identifies three employment actions that she contends are adverse:  (1) the Pacific Life reassignment, (2) the "shoddy" and "damaging" investigation conducted by UBS with respect to her complaints, and (3) her termination.

For purposes of Title VII's anti-retaliation provision, adverse employment actions are "employer actions that would have been materially adverse to a reasonable employee or job applicant." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).  Actions are materially adverse for retaliation purposes if they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination," and may extend "beyond workplace-related or employment-related retaliatory acts and harm." *Hicks v. Baines,* 593 F.3d 159, 165 (2d. Cir. 2010) (citing *Burlington Northern*, 548 U.S. at 67). Nevertheless, "petty slights or minor annoyances that often take place at work and that all employees experience" do not constitute actionable retaliation. *Burlington Northern*, 548 U.S. at 68.  "Title VII's anti-retaliation protection is broader than its anti-discrimination protection and prohibits some actions which might not affect the 'terms and conditions of employment.'" *Bind v. City of N.Y.*, No. 08 Civ. 11105, 2011 WL 4542897, at *18 (S.D.N.Y. Sept. 30, 2011) (quoting *Baines*, 593 F.3d at 165).

There is no dispute that Flood's termination constitutes an adverse employment action. There is, however, some dispute as to whether the other three actions constitute adverse employment actions.

With respect to the Pacific Life reassignment, a reasonable person could well be dissuaded from making a claim of discrimination if that person knew the consequence of making the claim would be to lose the chance to pursue a significant business opportunity with one's client.  This especially seems true for someone in Flood's position because her performance is assessed largely on her ability to develop relationships and cultivate opportunities for UBS to obtain new business.

The issue of whether the investigation itself constitutes an adverse employment action is a different story.  UBS cites *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712 (2d Cir. 2010) for the proposition that "an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint." *Id.* at 721.  In *Fincher*, the plaintiff made a comment to the Senior Director of Employee Relations, who also was a social acquaintance of the plaintiff's, that she believed African-American employees did not receive the same level of training as white employees. *See id.* at 717.  The plaintiff's employer did not investigate the allegation, and the plaintiff alleged that its failure to do so constituted an adverse employment action taken in retaliation for making the comment in the first place.  The Second Circuit held otherwise, concluding that "a reasonable employee in Fincher's place had nothing to lose by bringing this complaint, or another one following it, because the result of bringing the complaint and not bringing the complaint under the conditions alleged was the same:  the complaint would not be investigated." *Id.* at 722.

Here, however, Flood does not argue that the investigation was adverse because UBS failed to investigate at all.  Instead, Flood contends that the investigation amounted to an "[a]ffirmative effort[] to punish a complaining employee," *id.* at 721, because, as discussed above, (1) UBS interviewed employees who were not directly involved in the discrimination alleged, (2) UBS failed to interview non-UBS employees, and (3) UBS's report used unflattering adjectives to describe Flood.  None of these things, however, reasonably would dissuade an employee from bringing a discrimination complaint.  Flood contends that because UBS interviewed "unnecessary" witnesses, Flood's co-workers became aware of her complaint, and, as a result, her reputation at UBS was harmed, as evidenced by the negative "360 reviews" submitted by her peers.  But Flood has submitted no evidence to suggest that her co-workers' awareness of her complaint was the reason for their negative comments, and Flood has cited no authority for the proposition that an employee suffers an adverse employment action if some of her co-workers become aware that she has made a discrimination complaint.  Under these circumstances, UBS's handling of Flood's complaint is not an adverse employment action.

### c.  Causal Connection

An employee may present proof of causation either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or . . . (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y. City Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir. 2000); *see also Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993).  "Close temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection." *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). "[T]he Second Circuit 'has not drawn a bright line to define the outer limits beyond which a

temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action.'" *Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486, 512 (E.D.N.Y. 2011) (quoting *Gorman–Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001)).  But "courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation." *Id.* (collecting cases).  And courts in this Circuit have found delays of about six weeks to allow such an inference. *See, e.g.*, *Memnon v. Clifford Chance US, LLP*, 667 F. Supp. 2d 334, 345 (S.D.N.Y. 2009) ("The time elapsed between this failure and the protected activity, approximately 6 weeks, could be seen as sufficient to satisfy the causation prong of the *prima facie* claim."); *Khan v. Hip Centralized Lab. Servs.*, No. CV–03–2411 (DGT), 2008 WL 4283348, at *4 (E.D.N.Y. Sept. 17, 2008) ("Khan sent his letter to Ghirardi, complaining about his treatment in Client Services, about six weeks before his suspension.  This temporal proximity is sufficiently close to allow the jury to find that the suspension was retaliatory . . . ."). *Cf. Nagle v. Marron*, --- F.3d. ----, 2011 WL 6142196, at *8 (2d Cir. Dec. 12, 2011) (stating, in the context of a retaliation claim under 42 U.S.C. § 1983, "While we have not 'drawn a bright line' defining the maximum time period that can give rise to an inference of causation, six weeks fits comfortably within any line we might draw" (citations omitted)).

Here, the Pacific Life reassignment occurred about one month after Flood complained to McGowan about the Russell reassignment.  Flood's termination occurred six weeks after her final meeting with Seebrath.  These time periods are short enough to establish causation based on temporal proximity.  Accordingly, Flood has established a *prima facie* case of retaliation.

### d.  Legitimate Non-retaliatory Reason and Pretext

UBS's legitimate, non-retaliatory reason for the Pacific Life reassignment is that it was a business decision based on Fallon's personal relationship with Muench, the decision-maker at Pacific Life.  UBS's legitimate reason for Flood's termination is that she was fired as part of a reduction in force.  Accordingly, the burden shifts to Flood to offer evidence from which a reasonable factfinder could conclude that UBS's legitimate reasons are pretextual and that the real reason for the adverse actions was her protected activities.

With respect to the Pacific Life reassignment, Flood has not offered sufficient evidence from which a reasonable factfinder could conclude that the reassignment more likely than not was retaliatory.  The primary evidence Flood cites in support of her case on this point is the disputed nature of the relationship between Fallon and Muench.  To be sure, McGowan testified that he believed that Fallon had a personal relationship with Muench, while Muench described Fallon as a professional, business contact.  But under these circumstances, the distinction is hardly material.  As discussed above, it is undisputed that Fallon had known Muench longer than Flood, that Fallon previously worked with Muench, and that their relationship was at least professional.  That McGowan may have overestimated the quality of the relationship is insufficient to call into question its genuineness.  The same is true with respect to McGowan's reaction to Flood's inquiry about the Russell reassignment.  While it may seem tempting to connect the anger McGowan expressed during his phone call with Flood to the reassignment of the Large Cap Growth opportunity a month later, it makes little sense to do so when, during the same voice mail in which McGowan informed Flood of the Pacific Life Large Cap Growth reassignment, he also suggested that he and Flood set up a call with a different Pacific Life decision-maker (Dewey Bushaw) in the next week or so.  Such conduct is far more consistent

with ordinary business decision-making than with retaliatory animus.  Accordingly, there is no genuine issue of material fact with respect to whether the Pacific Life reassignment was retaliatory.

With respect to Flood's termination, there is no question that Fallon brought in significantly more business to UBS than did Flood and that Fallon was well regarded by many at UBS.  There also is no question that UBS's reduction in force affected the entire company, not just the Financial Institutions Group.  Thus the decision to terminate Flood is rational on its face. The fact that Flood's termination occurred six weeks after the end of UBS's investigation of her complaint, in light of the straightforward business justification for UBS's action, is not sufficient to avoid summary judgment.  The "timing of events alone, even if sufficient to meet the plaintiff's prima facie burden, cannot defeat summary judgment in the face of defendant's proffered legitimate reason." *Reilly v. Metro-North Commuter R.R. Co.*, No. 93 Civ. 7317, 1996 WL 665620, at *14 (S.D.N.Y. Nov. 15, 1996); *see also Murray v. Visiting Nurse Servs.*, No. 05 Civ. 5462, 2007 WL 3254908, at *15 n.14 (S.D.N.Y. Oct. 31, 2007) ("[M]ere temporal proximity, by itself, is insufficient to support a claim of retaliation at the summary judgment stage, at least where the defendant proffers a legitimate reason for the plaintiff's discharge with evidentiary support therefor.").

Flood makes much of a meeting at which she claims a UBS director of Human Resources, Seebrath, informed her that she was being "uncooperative" and that "this has been very disruptive to the group," and where McGowan stated that "this [investigation] was a big distraction, huge . . . for the team." (Pl.'s Dep. 320.)  But Seebrath's comment is not particularly probative of UBS's intent in discharging Flood because there is no evidence that Seebrath was connected in any way to that decision.  With respect to McGowan's comment, it was made at the

tail end of a seven month investigation into his treatment of Flood and during a meeting in which the participants expected to lay the matter to rest but were unable to do so satisfactorily.  It thus is just as indicative of a sense of frustration on McGowan's part at that particular moment as it is of his mindset six weeks later when he decided to recommend Flood for inclusion in the reduction in force.  Furthermore, there is no evidence that McGowan was uncooperative in any way during the two investigations, and it is undisputed that McGowan and Flood's relationship remained professional, if somewhat chilled, throughout the duration of the investigations.  When looked at in context, therefore, McGowan's comment, even viewed in the light most favorable to Flood, is insufficient to permit a reasonable factfinder to conclude that UBS's legitimate reason for discharging Flood more likely than not was pretextual.  UBS fired Flood as part of a reduction in force.  A major reason for her inclusion in the reduction was that she had brought in significantly less new business to UBS than her co-worker Fallon.  In two years with UBS, Flood brought in $6 million in new business.  Fallon, on the other hand, brought in $80 million of new business in his first twelve months at UBS.[8]  This is a significant difference and provides strong evidence to support UBS's legitimate reason for firing Flood.  Where a "plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there [is] abundant and uncontroverted independent evidence that no [retaliation] had occurred," summary judgment in favor of the employer is appropriate. *Cross*, 417 F.3d at 249.  That is the case here.  Balanced against the strength of the UBS's legitimate reason for her termination, Flood's evidence of retaliation—McGowan's single comment and Flood's unsupported speculation that UBS used an improperly conducted investigation to infect Flood's peer reviews—is insufficient to permit a

---

[8] At oral argument, the parties informed the Court that UBS did not obtain any new business from Russell after Flood was removed from the account, and while UBS eventually did obtain new business from Pacific Life, that business was obtained only after Muench requested that Flood be removed from the account.  Thus, any suggestion that but for her removal from those accounts Flood would have brought in more business than she actually did is entirely speculative, and any inference to that effect is not reasonable based on the evidence.

reasonable factfinder to conclude that retaliatory animus more likely than not played a role in her termination.  Accordingly, UBS is entitled to summary judgment on this claim.

### B.  NYCHRL Claims

UBS contends that Flood's NYCHRL claims should be analyzed in the same manner as her Title VII claims.  While that is true in some respects, it is not entirely accurate. "[C]laims under the City HRL must be given 'an independent liberal construction' . . . ." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (quoting *Williams v. N.Y. City Hous. Auth.*, 872 N.Y.S.2d 27, 31 (App. Div. 2009)). This construction must be given "in all circumstances, even where State and federal civil rights laws have comparable language.  The independent analysis must be targeted to understanding and fulfilling . . . the City HRL's 'uniquely broad and remedial' purposes, which go beyond those of counterpart State or federal civil rights laws." *Williams*, 872 N.Y.S.2d at 31 (quoting Admin. Code of the City of New York, § 8–130).

As this Court has noted, "It appears that the primary effect of the NYCHRL 'liberal construction analysis' is to create an expanded definition of what constitutes an adverse action." *Bind*, 2011 WL 4542897, at *19.  With respect to retaliation claims, the NYCHRL drops the requirement that a plaintiff demonstrate that he or she suffered a materially adverse action. *Williams*, 872 N.Y.S.2d at 34.  Instead, plaintiffs need merely show that the complained of conduct was "reasonably likely to deter a person from engaging in protected activity." *Id.*  Of course, this language is very similar to the language used by the Supreme Court to describe a materially adverse action in the retaliation context. *See Burlington Northern*, 548 U.S. at 57 (describing materially adverse action as one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination.").  And while the First Department specifically advised that these two standards are not to be considered the same, *Williams*, 872 N.Y.S.2d at 34

n.12, "the difference between them is somewhat elusive." *Kerman-Mastour v. Fin. Indus. Regulatory Auth., Inc.*, --- F. Supp. 3d ----, ----, 2011 WL 4526080, at *10 (S.D.N.Y. Sept. 30, 2011).

Even under the more liberal NYCHRL, summary judgment still will be appropriate where a plaintiff does not adduce sufficient evidence of a link between her termination and a discriminatory or retaliatory motive and where she fails to rebut convincing evidence that her employer treated her differently for legitimate business reasons, rather than her membership in a protected group. *See, e.g.*, *Clark v. Morelli Ratner PC*, 905 N.Y.S.2d 561, 562 (1st Dep't 2010); *Short v. Deutsche Bank Sec., Inc*., 913 N.Y.S.2d 64, 67 (1st Dep't 2010); *see also Melie v. EVCI/TCI College Admin*., 374 F. App'x. 150, 153–54 (2d Cir. 2010).

Here, as discussed above, summary judgment on Flood's Title VII discrimination claims is warranted because she has failed to adduce sufficient evidence to permit a reasonable factfinder to conclude that her gender more likely than not played a role in the adverse employment actions she suffered.  Accordingly, the result does not turn on the NYCHRL's expanded definition of adverse employment action.  Summary judgment on Flood's NYCHRL discrimination claims, like on her Title VII discrimination claims, therefore is appropriate.

Similarly, summary judgment on Flood's Title VII retaliation claim based on the Pacific Life reassignment and her termination is justified because of Flood's failure to produce sufficient evidence to overcome UBS's legitimate reason for these actions.  Thus, summary judgment likewise is appropriate on these claims under the NYCHRL.

As discussed above, however, the Court found that UBS's investigation into Flood's discrimination complaint was not itself an adverse employment action under Title VII.  The NYCHRL's expanded definition of adverse employment action does not yield a different

36

conclusion.  It seems unlikely that a person reasonably would be deterred from making a complaint of discrimination under the circumstances presented here.  Flood's objection to UBS's investigation boils down to her belief that UBS should have interviewed some people that it did not, and that UBS should not have interviewed some people that it did.  But the investigations and the resulting reports appear on their face to have been adequate and undertaken in good faith, and Flood offers only weak evidence to suggest otherwise.  To permit Flood to seek to hold UBS liable for failing to permit her to direct the scope of a facially adequate investigation simply does not seem necessary to effectuate even the "uniquely broad and remedial" purposes of the NYCHRL.  *Williams*, 872 N.Y.S.2d at 31.  Accordingly, summary judgment on Flood's claim that UBS's investigation itself was retaliatory is appropriate.

**CONCLUSION**

For the reasons stated above, defendant UBS's motion for summary judgment [17] is GRANTED in its entirety.  The Clerk is directed to close this case.

SO ORDERED.

Dated: New York, New York
   February __, 2012

_____
Richard J. Holwell
United States District Judge

38